2012 COA 195

**The PEOPLE of the State of Colorado, Petitioner–Appellee,**

**In the Interest of A.R., a Child,**

**and**

**Concerning F.N., Respondent–Appellant,**

**and**

**F.S. and A.S., Intervenors.**

**No. 11CA1448.**

Colorado Court of Appeals, Div. II.

Nov. 8, 2012.

As Modified on Denial of Rehearing Dec. 27, 2012.

Sheryl Rogers, County Attorney, Linda L. Boulder, Assistant County Attorney, Durango, Colorado, for Petitioner–Appellee.

Nancy J. Walker–Johnson, Guardian Ad Litem.

Steven Wells, Durango, Colorado, for Respondent–Appellant.

Opinion by Judge LICHTENSTEIN.

¶ 1 In this dependency and neglect proceeding, F.N. (mother) appeals from the judgment terminating her parent-child legal relationship with A.R. The Department of Human Services (department) joins mother's appeal of the termination and also challenges that part of the judgment addressing the department's guardianship. We affirm the judgment terminating mother's parental rights, reverse that part of the judgment addressing guardianship, and remand.

¶ 2 Because A.R. is an "Indian child" as defined in 25 U.S.C. § 1903(4) (2006), these proceedings are subject to the Indian Child Welfare Act, 25 U.S.C. §§ 1901 to 1963 (2006) (the ICWA).

¶ 3 This case revisits whether the ICWA's "active efforts" standard requires more effort than the "reasonable effort" standard in non-ICWA cases. Disagreeing with another division of this court, we conclude that it does.

¶ 4 We also conclude that, under the circumstances of this case, the termination judgment in this case may stand. However, we conclude that the court deviated from the ICWA's placement preferences when, in granting the department guardianship, it denied the department authorization to place A.R. with her maternal uncle (A.W.) and his wife (C.W.) for purposes of adoption.

## I. Background

¶ 5 The department assumed custody of A.R. and placed her in foster care on June 1, 2009, after she was found wandering by herself near a river and a highway. At the time, A.R. was two and one-half years old and was being cared for by her adult sister. The department had received fourteen prior reports concerning A.R. and mother's other children, and at the time the department took custody of A.R., mother was homeless and struggling with alcohol addiction. The department temporarily placed A.R. with a foster family.

¶ 6 In July 2009, the court adjudicated A.R. dependent and neglected as to mother and approved the department's proposed treatment plan. The Navajo Nation, of which mother is an enrolled member, participated in the proceedings.

¶ 7 In October 2010, the department moved for termination and informed the court of the Navajo Nation's lack of progress in completing a home study and approving

A.W. and C.W. for placement. The termination hearing began in January 2011.

¶ 8 However, at the April 2011 continuation of the termination hearing, the department altered its position. It had conducted a favorable home study on A.W. and C.W. and now urged the court that placement with A.W. and C.W. would be a less drastic alternative and would satisfy the ICWA's placement preferences. The Navajo Nation also supported A.R.'s placement with A.W. and C.W. But the guardian ad litem (GAL) urged the court to find good cause to deviate from the ICWA placement preference.

¶ 9 The court deferred any placement decisions, either in the context of considering less drastic alternatives to termination or in the context of placement following termination. It continued the termination hearing for sixty days to receive further information as to whether A.W. and C.W. were fully cognizant of A.R.'s pervasive developmental delays, were equipped to deal with her special needs, and would have the necessary services available to them in New Mexico, where they lived. In the meantime, it found, beyond a reasonable doubt, that each of the remaining requisites for termination had been met.

¶ 10 At the June 2011 hearing, the court received evidence concerning A.R.'s special needs, including testimony from A.W., C.W., A.R.'s foster mother, and various caseworkers, psychologists, and staff at A.R.'s current school.

¶ 11 At the conclusion of the hearing, the court terminated mother's parental rights. As pertinent here, it concluded that placement with A.W. and C.W. was not a less drastic alternative to termination. The court found, beyond a reasonable doubt, that long-term placement, whether with a relative or in a foster home, was not a viable alternative because, due to her need for permanency, it was not in A.R.'s best interests to leave her in limbo. In this regard, the court also considered the ICWA placement preferences. It applied the Guidelines for State Courts: Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,693 (1979) (BIA Guidelines), to find, beyond a reasonable doubt, that an ICWA placement was not a viable less drastic alternative due to A.R.'s "extraordinary physical or emotional needs."

¶ 12 The court also found, beyond a reasonable doubt, that the department had exercised "best efforts" to rehabilitate mother, but that mother could not meet A.R.'s needs despite the treatment and services offered by the department.

¶ 13 Upon terminating mother's parental rights, the court (1) denied the department's motion for a trial home visit with A.W. and C.W. and (2) granted guardianship of A.R. to the department, "including the authority to consent to the adoption of [A.R.], except that the [d]epartment does not have authority to place her with [A.W. and C.W.] for this purpose." This appeal followed.

¶ 14 Mother contends that the court erred in terminating her parental rights asserting that the department did not meet the ICWA's "active efforts" requirement, and there were viable less drastic alternatives to termination, including A.R.'s placement with A.W. and C.W. The department joins these arguments, and contends that, even if the court's termination of mother's parental rights was proper, the court erroneously deviated from the ICWA's placement preferences when, in granting the department guardianship, it denied the department permission to place A.R. with A.W. and C.W. for purposes of adoption. Under the circumstances here, we affirm the court's termination of mother's parental rights; however, we agree with the department that the court's guardianship order improperly deviated from the ICWA's placement preferences.

## II. The ICWA

■ ¶ 15 The ICWA protects the stability and security of Indian tribes and families by establishing minimum federal standards for removing Indian children from their families. 25 U.S.C. § 1902 (2006). It was the product of rising concern over the consequences to Indian children, families, and tribes of "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Mississippi Band of Choctaw Indians v. Holyfield*, 490

U.S. 30, 32, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). Senate hearings on the statute documented what one witness called "[t] he wholesale removal of Indian children from their homes, ... the most tragic aspect of Indian life today." *Id.*

¶ 16 The ICWA applies to any child custody proceeding involving an Indian child, including one in which the state seeks to place an Indian child in foster care or the state seeks to terminate parental rights. *See* 25 U.S.C. §§ 1911, 1912 (2006); *People in Interest of S.R.M.,* 153 P.3d 438, 440 (Colo.App.2006). It also applies, after the termination of parental rights, to preadoptive and adoptive placements. *See* 25 U.S.C. § 1915(a)-(b) (2006). The ICWA is based on the presumption that the protection of an Indian child's relationship with the tribe is in the child's best interests. *People in Interest of A.T.W.S.,* 899 P.2d 223, 224 (Colo.App. 1994). Section 19–1–126, C.R.S.2012, ensures compliance with and consistent application of the ICWA.

### A. Standard of Review

¶ 17 The trial court's interpretation of the ICWA is a question of law that we review de novo. *In re N.B.,* 199 P.3d 16, 18 (Colo.App.2007). When interpreting a statute, our primary goal is to determine and give effect to legislative intent. *Spahmer v. Gullette,* 113 P.3d 158, 161–62 (Colo.2005). Because we are construing a federal statute, we turn to well-established rules of federal statutory interpretation. *See Copeland v. MBNA Am. Bank,* 907 P.2d 87, 90 (Colo. 1995). Therefore, we look first to the plain language of the statute, giving words and phrases their plain and ordinary meaning. *Roberts v. Sea–Land Servs., Inc.,* —— U.S. ——, ——, 132 S.Ct. 1350, 1356, 182 L.Ed.2d 341 (2012); *see also Spahmer,* 113 P.3d at 161–62.

¶ 18 The United States Supreme Court has instructed that statutes enacted for the benefit of Indians, as well as regulations, guidelines, and state statutes promulgated for their implementation, must be liberally construed in favor of Indian interests. *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 764, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985).

¶ 19 Whether the department made adequate "active efforts" is a mixed question of fact and law, as is whether there is "good cause" to deviate from the ICWA's placement preferences. Thus, we review the trial court's factual findings for an abuse of discretion and its legal conclusions de novo. *People in Interest of C.Z.,* 262 P.3d 895, 905 (Colo.App.2010).

### B. Active Efforts

¶ 20 Mother contends that the court erred in terminating her parental rights because (1) the court did not apply the ICWA's "active efforts" standard to the department, and (2) the department did not meet the ICWA's active efforts requirement. For the reasons set forth below, we agree that the court did not use the correct standard; nonetheless, we conclude that the department satisfied the "active efforts" requirement of the ICWA, and therefore, we decline to disturb the termination on this basis.

### 1. Burden of Proof

¶ 21 As a preliminary matter, we reject mother's contention that the trial court erred when it applied a clear and convincing evidence standard in determining whether the department provided active efforts. There is a split of authority between two divisions of this court whether "active efforts" must be proved beyond a reasonable doubt, *see People in Interest of R.L.,* 961 P.2d 606, 608 (Colo.App.1998), or by clear and convincing evidence, *see C.Z.,* 262 P.3d at 904–05. We need not revisit this question because, contrary to mother's contention, the record shows that the court made all of its findings beyond a reasonable doubt.

### 2. Active Efforts Standard

¶ 22 Mother next contends that the trial court erred because it applied a non-ICWA standard when, as part of its termination judgment, it determined that the department used its "best efforts" to rehabilitate mother. We note that in its review orders prior to termination, the court referenced the depart-

ment's efforts to rehabilitate mother, and used the term "reasonable efforts," which is the standard in non-ICWA cases. *See* § 19–3–604(2)(h), C.R.S.2012. In any event, we agree with mother that the court applied an incorrect standard.

¶ 23 Because A.R. is an Indian child, this termination proceeding is subject to the ICWA, and thus the court was required to apply the ICWA standard of "active efforts." The ICWA provides, as pertinent here:

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State laws shall satisfy the court that *active efforts* have been made *to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family* and that these efforts have proved unsuccessful.

25 U.S.C. § 1912(d) (2006) (emphasis added).

a. Active Efforts vs. Reasonable Efforts

¶ 24 Another division of this court, in *People in Interest of K.D.*, 155 P.3d 634, 637 (Colo.App.2007), held, without an accompanying analysis, that the "active efforts" standard is equivalent to the "reasonable efforts" standard applied in non-ICWA cases. For the following reasons, we decline to follow *K.D. See City of Steamboat Springs v. Johnson*, 252 P.3d 1142, 1147 (Colo.App.2010) (a division of this court is not bound to follow a prior division's ruling).

¶ 25 The ICWA does not define "active efforts." However, when determining the meaning of a federal statute, we must start with the general assumption that "in the absence of a plain indication to the contrary, . . . Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Holyfield*, 490 U.S. at 43, 109 S.Ct. 1597 (quoting *Jerome v. United States*, 318 U.S. 101, 104, 63 S.Ct. 483, 87 L.Ed. 640 (1943)). One reason for this rule of construction is that federal statutes are generally intended to have uniform nationwide application. *Id.* Congress's express statement of policy in the ICWA is to promote the best interests of Indian children "by the establishment of minimum Federal standards for the removal of Indian children from their families." 25 U.S.C. § 1902. Thus, Congress plainly indicated its intent that the federal standards set forth in the ICWA are the minimum standards to be applied by the states.

¶ 26 For example, the Supreme Court of South Dakota applied three rules of statutory construction to conclude that Congress did not intend for states to apply their "reasonable efforts" standards in cases involving Indian children. *In Interest of J.S.B.*, 691 N.W.2d 611, 619 (S.D.2005). First, the ICWA does not include any exceptions to the "active efforts" requirement. *Id.* Second, the ICWA is the more specific statute, as it deals with a discrete segment of "Native American families, who Congress found were best served by maintaining their relationships with their tribes and extended families." *Id.* Third, when interpreting a statute pertaining to Indians, the United States Supreme Court has stated that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Id.* (quoting *Blackfeet Tribe*, 471 U.S. at 766, 105 S.Ct. 2399).

¶ 27 Given that the federal standard is intended to have nationwide application, several states have analyzed whether the ICWA's "active efforts" standard is equivalent to a state's "reasonable efforts" standard. Virtually all of these jurisdictions have concluded these two standards are not equivalent. *See Winston J. v. State*, 134 P.3d 343, 347 n. 18 (Alaska 2006); *In re JL*, 483 Mich. 300, 770 N.W.2d 853, 865 (2009); *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn.Ct.App.2007); *In re A.N.*, 325 Mont. 379, 106 P.3d 556, 560 (2005); *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55, 61 (2008); *In re J.S.*, 177 P.3d 590, 593 (Okla.Civ.App.2008); *Dep't of Human Services v. K.C.J.*, 228 Or.App. 70, 207 P.3d 423, 425 (2009); *People in Interest of P.S.E.*, 816 N.W.2d 110, 115 (S.D.2012); *J.S.B.*, 691 N.W.2d at 619; *State ex rel. C.D.*, 200 P.3d 194, 205 (Utah Ct.App.2008).

¶ 28 These jurisdictions have followed the rationale of cases that have given the phrase "active efforts" its plain and ordinary meaning and, in particular, have concluded that

the word "active" cannot include "passive." *See, e.g., David S. v. State,* 270 P.3d 767, 778 (Alaska 2012). Consequently, "active efforts" require more than "reasonable efforts," as the latter may include such passive efforts as "where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition." *Id.* (quoting *A.A. v. State,* 982 P.2d 256, 261 (Alaska 1999)); *see P.S.E.,* 816 N.W.2d at 115 (giving the parent a treatment plan and waiting for him to complete it would constitute passive efforts). Thus, in a termination proceeding, "reasonable efforts" may be satisfied by requiring a parent to find a job, to acquire new housing, and to terminate a relationship with what is perceived to be a boyfriend who is a bad influence; in contrast, "active efforts" under the ICWA would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child. *A.A.,* 982 P.2d at 261 (citing with approval a commentator's distinction between active and passive efforts).

¶ 29 We are persuaded by the above authority, and are persuaded that the policy behind the ICWA, including Congress's intent to achieve uniformity among the states, compels the conclusion that the ICWA's "active efforts" standard requires more than the "reasonable efforts" standard in non-ICWA cases.

¶ 30 In reaching this conclusion we expressly decline to follow *K.D.* The *K.D.* division's opinion made Colorado one of only two states directly addressing the issue to have concluded that the ICWA's "active efforts" requirement is equivalent to the state's "reasonable efforts" requirement in non-ICWA cases. *See K.D.,* 155 P.3d at 637; *In re Adoption of Hannah S.,* 142 Cal.App.4th 988, 998, 48 Cal.Rptr.3d 605, 612 (2006).

b. The Court's "Best Efforts" Ruling

¶ 31 In its written termination judgment, the court ruled that the department "had exercised [its] best efforts to find a placement for [A.R.] that met the preference requirements of [the] ICWA." The court further found that "[the department] exercised [its] best efforts at rehabilitation for [mother.]" It also found that "the uncontroverted evidence was that [mother] is simply unable to meet [A.R.'s needs] despite the treatment and services offered by the [d]epartment."

¶ 32 We agree with mother that the court did not apply the requisite "active efforts" standard under the ICWA. However, to determine whether the court's findings are fatal to the termination judgment, we must determine whether, despite the court's use of the term "best efforts," the record supports the court's determination that the department's actions met the requisite standard. *See C.Z.,* 262 P.3d at 906 (citing *In re Nicole B.,* 410 Md. 33, 976 A.2d 1039, 1058 (2009) ("we should examine the substance of the Department's ... actions; we should not decide the case based upon the use, or failure to use, the statutory label 'active efforts' ")).

c. The Department's Actions

¶ 33 The record shows that the department (1) arranged and supervised visits both at mother's apartment and the library, (2) rescheduled visits to accommodate mother's schedule, (3) referred mother for a substance abuse and neuropsychological evaluation, (4) provided a home-based therapist, (5) gave mother vouchers and bus passes, (6) provided resources for obtaining housing, and (7) arranged for participation in the Nurturing Parent program and attempted to obtain services from parents and teachers. Therefore, we conclude that the record supports the court's determination that the department's actions met the requisite standard with regard to mother. *See C.Z.,* 262 P.3d at 906 (the following satisfied the active efforts requirement: the department gave mother referrals to mental health and substance abuse treatment providers and paid for her treatment; provided parenting classes; offered to help her apply for food stamps, housing, and other public assistance programs; and provided her with transportation to and from various appointments and her visits with the child); *see also In re Kreft,* 148 Mich.App. 682, 384 N.W.2d 843, 848–49 (1986) (offers of help in obtaining public assistance, finding housing, and arranging visits constituted "active efforts").

¶ 34 Mother further argues that, pursuant to 25 U.S.C. § 1912(d), the department was also required to provide A.W. and C.W. with active efforts. Here, the court addressed the department's efforts toward placing A.R. with A.W. and C.W. In this regard, it concluded the department exercised its "best efforts" to satisfy the ICWA placement preferences. Assuming without deciding that, in a termination proceeding, the ICWA requires that active efforts be made with respect to family members beyond a child's parent or custodian, we note that the record shows that the department performed the following services for A.W. and C.W.: (1) provided parenting classes to prepare them to meet A.R.'s special needs, (2) identified services for A.R. in New Mexico, (3) facilitated visits with A.R., (4) contacted schools in their area to determine if those schools would provide A.R. with services, and (5) reviewed A.R.'s Individualized Education Plan (IEP) and medical evaluations with them. Therefore, despite the court's use of the term "best efforts," the record supports the court's determination that the department's actions met the requisite standard with regard to A.W. and C.W.

### III.  Less Drastic Alternatives to Termination

¶ 35 Next, mother contends that the court erred in concluding that placement with C.W. and A.W. was not a viable less drastic alternative to termination of her parental rights. We disagree.

¶ 36 To terminate parental rights under section 19–3–604(1)(c), C.R.S.2012, the court must find that (1) an appropriate, court-approved treatment plan has not been complied with by the parent or has not been successful in rehabilitating the parent; (2) the parent is unfit; and (3) the parent's conduct or condition is unlikely to change within a reasonable time. *People in Interest of C.H.*, 166 P.3d 288, 289 (Colo.App.2007).

¶ 37 Implicit in this statutory scheme is a requirement that the trial court consider and eliminate less drastic alternatives before entering an order terminating the parent-child legal relationship. *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo.

1986); *K.D.*, 155 P.3d at 639. In considering whether there is a less drastic alternative to terminating parental rights, the court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *People in Interest of M.B.*, 70 P.3d 618, 626 (Colo.App.2003).

¶ 38 In determining whether placement with a relative or other person is a viable less drastic alternative to termination, the court may consider various factors, including whether an ongoing relationship with the parent would be beneficial or detrimental to the child. *See People in Interest of J.L.M.*, 143 P.3d 1125, 1127 (Colo.App.2006) (upholding court's order finding that permanent placement with the maternal grandparents was a viable less drastic alternative to termination of mother's parental rights but not as to termination of father's parental rights). This determination will be influenced by a parent's fitness to care for his or her child's needs. *See* § 19–3–604(2), C.R.S. 2012; *People in Interest of A.N.W.*, 976 P.2d 365, 370 (Colo.App.1999) (an unfit parent is one whose conduct or condition renders him or her unable to give the child reasonable parental care, which includes nurturing and protection adequate to meet the child's physical, emotional, and mental health needs).

¶ 39 And when, as here, the termination proceeding concerns an Indian child, the ICWA imposes additional minimum federal standards with which a state court must comply. 25 U.S.C. § 1902; *R.L.*, 961 P.2d at 608. A court may not terminate parental rights unless evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, establishes that the parent's continued custody of the child is likely to result in serious emotional or physical damage to the child. 25 U.S.C. § 1912(f); *A.N.W.*, 976 P.2d at 370.

¶ 40 Here, the trial court found, with record support, that although mother substantially complied with her treatment plan, it was unsuccessful in rendering her a fit parent and that her conduct or condition was not likely to change within a reasonable time. It also found that A.R. needs lifelong care or

intensive services for her special needs, and mother is "simply unable to provide those services." The court stated it gave primary consideration to A.R.'s physical, mental, and emotional condition and needs, to conclude that it was in her best interests to terminate her relationship with mother.

¶ 41 Further, long-term or permanent placement with a family member or foster family, short of termination, may not be a viable less drastic alternative if it does not provide adequate permanence that adoption would provide or otherwise meet a child's needs. *People in Interest of T.E.M.*, 124 P.3d 905, 910 (Colo.App.2005); *People in Interest of J.M.B.*, 60 P.3d 790, 792 (Colo. App.2002). In this regard, the court also found, with record support, that placement of A.R. without terminating mother's parental rights was not in A.R.'s best interests because she needs permanency. It determined that "an ICWA placement, or any placement for that matter, is not a less drastic alternative under the 'extraordinary physical or emotional needs' guideline."

¶ 42 Because the record supports the trial court's findings with regard to the child's best interests and need for permanency, we conclude that the court did not err in finding that there were no less drastic alternatives to termination.

¶ 43 For two reasons, we are not persuaded by mother's allegation that the court did not appropriately consider the ICWA placement preferences in considering less drastic alternatives. First, mother and the department are not challenging the placement of A.R. prior to the termination hearing. Although, as explained below, we agree that the court erred in its consideration of the ICWA placement preferences in determining whether a post-termination placement was appropriate with A.W. and C.W., we offer no opinion on the propriety of initially placing A.R. with her foster parents.

¶ 44 Second, the ICWA placement preferences are relevant in determining which among a choice of placements is in the child's best interest. In contrast, a less drastic alternative analysis considers whether *any* placement, short of termination, would

be in the child's best interest. Here, when considering less drastic alternatives, the court was not required to choose between placement options, to which the ICWA placement preferences would apply. *See* 25 U.S.C.1915 (applying preferences to all adoptive, foster care, or preadoptive placements involving indian children). Instead, the court was required to determine whether any placement without terminating mother's parental rights would be in A.R.'s best interests. To the extent *A.N.W.*, 976 P.2d at 368–69, suggests otherwise, we decline to follow it. *See City of Steamboat Springs*, 252 P.3d at 1147.

¶ 45 Here, the court found that A.R.'s best interests could not be met short of terminating mother's parental rights, and the record supports this finding.

## IV. Guardianship

¶ 46 The department contends, that the court erroneously deviated from the ICWA's placement preferences when, as part of its termination judgment, it gave the department authority to consent to the adoption of A.R., but did not grant authority to place her with A.W. and C.W. for that purpose. The department also contests the court's denial of its motion for a trial home visit with A.W. and C.W., which would have enabled A.W. and C.W. to further appreciate and meet A.R.'s special needs. We agree that the court erred in deviating from the ICWA placement preferences and therefore reverse the trial court's judgment in this regard and remand with directions for the court to allow the department to arrange a home visit with A.W. and C.W. and to consider an adoption or preadoptive placement of A.R. consistent with the ICWA placement preferences, including possible placement with A.W. and C.W. or her foster parents.

¶ 47 As pertinent here, 25 U.S.C. § 1915(b) provides:

Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met.... In any foster care or preadoptive placement, a

preference shall be given, in the absence of good cause to the contrary, to a placement with—

(i) a member of the Indian child's extended family;

(ii) a foster home licensed, approved, or specified by the Indian child's tribe;

(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority;[1] or

(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

Courts have interpreted this statute as expressing a presumption that the child's best interests are served by placement with an extended family member who also has Indian heritage. *A.N.W.*, 976 P.2d at 369 (discussing § 1915(a)). To overcome this presumption, the party urging that the ICWA preferences not be followed—here, the guardian ad litem—must establish the existence of "good cause to the contrary." *See* 25 U.S.C. § 1915(b); *A.N.W.*, 976 P.2d at 369.

¶ 48 The ICWA does not define "good cause." However, the BIA Guidelines, 44 Fed.Reg. at 67,693, suggest that the good cause determination should be based on one or more of the following considerations:

(1) The request of the biological parents or the child when the child is of sufficient age.

(2) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

(3) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.

¶ 49 Here, A.W. and C.W. were identified by the department and the Navajo Nation as a suitable family for placement. However, the trial court determined that there was good cause to deviate from the ICWA's placement preferences. In so deciding, the court found beyond a reasonable doubt that (1) "there was no evidence that [A.R.] would receive services equivalent to the IEP pres-

ently in effect"; (2) A.W. and C.W. made "no showing that a full-time caretaker would be involved in A.R.'s care"; (3) A.W. and C.W. lacked a full appreciation of A.R.'s needs; (4) A.R. developed an attachment to her foster family and disruption of that attachment would result in short-term harm that would not be outweighed by the cultural benefits of being placed with a Navajo family. We address each of these findings in turn.

## A. Services Equivalent to IEP

¶ 50 The record does not support the trial court's finding that "there was no evidence that [A.R.] would receive services equivalent to the IEP presently in effect." We conclude that this finding was clearly erroneous for three reasons.

¶ 51 First, when a child who has an IEP transfers to another school district, federal law requires the local educational agency to provide "a free appropriate public education, including services comparable to those described in the previously held IEP." *See* 20 U.S.C. § 1414(d)(2)(C)(i)(I)(II) (2006).

¶ 52 Second, the plain language of 25 U.S.C. § 1915(b) states that a child "shall be placed in [a setting] in which his special needs ... may be met." Therefore, the plain language of the statute contains no requirement that the placement have *equivalent* services, but only requires that the placement is able to meet the child's special needs. Therefore, the trial court erred to the extent that it required A.W. and C.W. to provide the same services that the foster family provided.

¶ 53 Third, the court's finding that there is "no evidence" that A.R. would receive equivalent services if she was placed with A.W. and C.W. is not supported by the record. Instead, the record contains the following evidence regarding services available if A.R. were placed with A.W. and C.W.:

• A.W. testified that he contacted both a parochial and public school regarding enrollment and services available to assist with A.R.'s special needs.

---

1. The department alerted the court that A.R.'s foster family did "not satisfy the ICWA place-

ment preference."

- A.W. also testified that he had applied for A.R.'s enrollment in the public school, reviewed her evaluations and IEP, and affirmed that he would get A.R. the services that she needs.
- A.W. and the department's caseworker testified that the parochial school had a speech therapist currently on staff and would hire an occupational therapist.
- The department's caseworker testified that the public school and Headstart would honor and provide all of the special education services called for in A.R.'s current IEP, the private parochial school would provide occupational and speech therapy, and A.W. and C.W. would have access to services to educate them as caretakers of a child with special needs.
- The caseworker stated that A.R. would receive adequate services, which would be available at either the public or the private school.
- The department's psychologist also testified that the public school would honor A.R.'s IEP and provide occupational and speech therapy.

Accordingly, the trial court's finding that there was "no evidence" that A.R. would receive services if she was placed with A.W. and C.W. was clearly erroneous.

### B. Full–Time Caretaker

¶ 54 The trial court also found that A.W. and C.W. made "no showing that a full-time caretaker would be involved in A.R.'s care." This finding presents several factual and legal issues.

¶ 55 First, to the extent the trial court placed the burden on A.W. and C.W. to present evidence that A.R. would have a full-time caretaker, this improperly shifted the burden of proof from the guardian ad litem to A.W. and C.W. *See* BIA Guidelines, 44 Fed.Reg. at 67,693 (party urging that the ICWA preferences not be followed must establish the existence of good cause to the contrary). Second, A.W. testified that he and C.W. would share caregiving duties and that

he worked from home. Third, the BIA Guidelines, upon which the court relied, state that good· cause to deviate from the ICWA placement preferences may exist if a *qualified expert witness* establishes that the child has extraordinary physical or emotional needs. *Id.* However, the trial court stated in its oral and written rulings that it relied on the foster mother's testimony to conclude that A.R. needed full-time care. Therefore, the court's finding that A.R. needed a full-time caregiver and A.W. and C.W. would not provide one was based upon a misapplication of the burden of proof, was not supported by the testimony, and relied on legally insufficient, non-expert testimony.

### C. Appreciation of.A.R.'s Needs

¶ 56 Although the trial court found that A.W. and C.W. lacked a full appreciation of A.R.'s needs, it denied the department's request that A.W. and C.W. have a trial home visit with A.R. to assist them in appreciating her needs. Instead, the court relied, in part, on the couple's inability to meet with the foster family.[2] However, the record contains testimony that A.W. and C.W. (1) reviewed A.R.'s medical, psychological, and educational records, including her IEP; (2) spoke with officials at parochial, public, and BIA schools about the availability and provision of services; (3) attended classes to train them on the needs of a special needs child; (4) discussed A.R.'s needs with other family members to utilize their expertise in areas such as early education and social work and involve them in A.R.'s upbringing in the Navajo way; (5) spoke with A.R.'s current therapists; and (6) spoke with representatives of the Navajo Nation about available services. Therefore, the court's ruling relied on but one of many factors to assess A.W. and C.W.'s understanding of A.R.'s needs.

### D. Attachment to Foster Family

¶ 57 The court further found beyond a reasonable doubt that A.R. developed an attachment to her foster family and that disruption of that attachment would result in short-term harm that would not be out-

---

**2.** At the same time, the court acknowledged that the meeting did not take place due to cultural misunderstandings directly attributable to this family's Navajo background.

weighed by the cultural benefits of being placed with a Navajo family. This conclusion—which the court stated as a "factual finding"—is, in fact, a misapplication of the ICWA's placement preferences provision, which creates a presumption that placement with the Indian family is in the child's best interests.

¶ 58 Further, we question the validity of considering A.R.'s attachment to her foster mother in determining good cause to deviate from the ICWA's placement preferences. Another division of this court, relying on out-of-state authority, determined good cause may exist if there is a certainty of emotional or psychological damage to the child if removed from the foster family. *A.N.W.*, 976 P.2d at 369. However, in *Holyfield*, the Supreme Court disapproved of considering the disruption of a child's attachment to the non-Indian family, thereby vacating an adoption order as non-compliant with the ICWA. The Court stated,

> [T]he law cannot be applied so as automatically to "reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation." It is not ours to say whether the trauma that might result from removing these children from their adoptive family should outweigh the interest of the Tribe—and perhaps the children themselves—in having them raised as part of the [Indian] community.

*Holyfield*, 490 U.S. at 54, 109 S.Ct. 1597 (citation omitted; quoting *In re Adoption of Halloway*, 732 P.2d 962, 972 (Utah 1986)). Thus, we also conclude that the court erred in relying on A.R.'s attachment to her foster family in determining that the ICWA's placement preferences should not be followed.

¶ 59 For these reasons, we conclude that the court erroneously deviated from the ICWA's placement preferences when, in giving the department authority to consent to the adoption of A.R., it did not grant authority to place A.R. with A.W. and C.W. for that purpose. We therefore reverse that aspect of the judgment and remand with directions to allow the department to arrange a home visit with A.W. and C.W. and to consider an adoption or preadoptive placement of A.R. consistent with the ICWA placement preferences, including possible placement with A.W. and C.W. or her foster parents.

## V. Ineffective Assistance of Counsel

¶ 60 In her opening brief, mother asserted an ineffective assistance of counsel claim. However, following petition for rehearing and response, mother's counsel has indicated that mother no longer wishes to pursue this claim. Thus, we need not address it. *See C.H.*, 166 P.3d at 290–91.

## VI. Conclusion

¶ 61 The trial court's judgment terminating mother's parental rights is affirmed, but that aspect of the judgment granting the department authority to consent to the adoption of A.R., but not to place her with A.W. and C.W. for that purpose is reversed. The case is remanded to the trial court to enter judgment allowing the department to arrange a home visit with A.W. and C.W. and to consider an adoption or preadoptive placement of A.R. consistent with the ICWA placement preferences, including possible placement with A.W. and C.W. or her foster parents.

Judge CASEBOLT and Judge MILLER concur.