**The PEOPLE of the State of Colorado, Petitioner–Appellee,**

**and**

**In the Interest of M.B., a Child,**

**Concerning T.B., Respondent–Appellant.**

No. 01CA2451.

Colorado Court of Appeals, Division V.

April 10, 2003.

George H. Hass, County Attorney, David P. Ayraud, Assistant County Attorney, Fort Collins, Colorado, for Petitioner–Appellee.

Randall C. Lococo, Guardian Ad Litem.

Mark K. Workman, Fort Collins, Colorado, for Respondent–Appellant.

Opinion by Judge ROTHENBERG.

In this dependency and neglect proceeding, T.B. (mother), appeals from a judgment terminating her legal relationship with her child, M.B. The primary issue in this appeal is whether mother's right to due process was violated during the review process conducted before the magistrate pursuant to Colorado's permanency hearing statute, § 19–3–702, C.R.S.2002, and requires that the order of termination later entered by the district court be vacated. Because mother had a full and fair opportunity to be heard at the termination hearing, we conclude her right to due process was not violated. Accordingly, we affirm.

## I.

On September 12, 2000, the child, who was then two years old, was found wandering the streets. She was hungry and her body was covered with numerous and severe bruises. The police department took the child into protective custody and then released her to the county department of social services for placement in foster care.

Several hours later, mother was located and interviewed. She reported she had entrusted the care and discipline of the child to her boyfriend and he had caused the bruising. However, she stated she was present while the boyfriend beat the child and she heard the child screaming.

Because of the nature and extent of the child's bruises, medical and sexual abuse examinations were conducted, and the examination revealed numerous abrasions on and adjacent to the child's hymen. The examiner concluded they were "consistent with sexual abuse" and could have been caused by digital or penile contact.

When the boyfriend was interviewed, he admitted he had severely abused the child physically and sexually.

On September 15, 2000, a petition in dependency and neglect was filed naming mother and the boyfriend as respondents. Mother admitted the allegations in the petition, and the child was adjudicated dependent and neglected. On November 11, 2000, mother married the boyfriend, who is hereinafter referred to as the husband.

In November 2000, the magistrate approved a treatment plan for mother. The husband's treatment plan was approved in January 2001, at which time a dispositional order entered as to both mother and the husband. Also, in January 2001, mother was sent a written advisement of her legal and constitutional rights and written notice that a permanency hearing was set for March 1.

On March 1, as relevant here, the magistrate found that mother was working on the issues addressed by the treatment plan, but that it was too soon to determine whether the child could be returned to her. The magistrate continued the permanency hearing until April 12. At the April 12 hearing, issues were raised concerning the child's placement, but the magistrate deferred ruling on placement until the next hearing, which was set for April 24.

On April 24, the parties entered into an agreement to maintain the child in her foster care placement and to change the permanency plan to establish the goal of reunification. The agreement required mother to prohibit contact between the child and her husband, to obtain her own residence, and to participate in a parent-child interactional evaluation. The magistrate adopted the agreement and set the matter for review on May 17.

At the May 17 hearing, the magistrate formally changed the permanency plan to reflect the goal of reunification between the mother and child and signed a written order approving the child's ongoing foster care placement. However, on May 18, the People

moved to suspend unsupervised visits, citing concerns that arose during an evaluation.

On June 4, a review hearing was held and, as relevant here, the parties stipulated to, and the magistrate approved, a visitation schedule that included unsupervised visits. After the review hearing, mother and the department submitted proposed visitation orders, and on June 27, the magistrate signed the order submitted by the department. Mother objected, contending it did not accurately reflect the agreement, and at her request, a review hearing was set for June 28.

On June 27, the People filed an amended notice of hearing that referred to the June 28 hearing as a "permanency planning" hearing. On the same date, the department submitted a report to the magistrate designated "EXPEDITED PERMANENCY PLANNING CASE PERMANENCY PLAN REVIEW."

The department's June 27 report recited the facts set forth above and described the current situation of mother and the child. The department expressed several major concerns, including that mother had married the husband so soon after the severe abuse of her daughter and mother was still residing with him. The department also was concerned "[with mother's] role in her abuse of her daughter and the lack of ability to protect her daughter." The report added that mother had "a tendency to minimize the severity of the abuse"; her continued involvement with the husband had put "consistent pressure on [the child] to accept [him] as a father"; and mother "does not appear to have the motivation to make the significant behavioral changes which would be needed to ensure the child's safety."

The department recommended that a motion for termination of parental rights be filed because, as relevant here, "[Mother] has been presented with information in order to assist her in being able to reunify with her child. She has chosen to defend [the husband], continue a relationship with [him,] and is reportedly very enmeshed in her relationship with [him]."

On June 28, the parties appeared before the magistrate, but no evidence was received. After the People advised the magistrate of their intention to file a motion to terminate the parent-child relationship, the magistrate ordered that the case be transferred to the district court for a hearing.

On July 11, the magistrate's June 28 approval of the permanency plan and transfer to the district court were memorialized in a written order designated "Permanency Planning Order and Order Approving Ongoing Placement." The July 11 written order recited that the matter had come before the magistrate on June 28 for a "permanency planning hearing" and that the magistrate had reviewed the "permanency plan prepared by [the department] and set forth in a letter dated June 27, 2001."

The July 11 order concluded, as relevant here, that:

3. Reasonable efforts have been made to prevent out-of-home placement and to finalize the permanency plan. Pursuant to the facts and circumstances set forth in the permanency plan prepared by [the department] and set forth in a letter dated June 27, 2001, it would be contrary to the best interests of the [c]hild to be returned to the custody of [mother] at this time. Further, there is not a substantial probability that the [c]hild will be returned to the physical custody of [mother] within six months of the date this Order is executed.

4. In light of the above, the [magistrate] finds the permanency plan prepared by [the department] and set forth in a letter dated June 27, 2001, which by this reference is incorporated herein to be appropriate and in the best interests of the [c]hild.

5. The [magistrate] finds that the permanency plan for the [c]hild is a determination of whether the parent/child relationships should be terminated. . . .

Mother filed a petition for review in the district court, contending the magistrate had violated her right to due process by failing to conduct a permanency hearing *before* changing the permanency plan goal from reunification to termination.

In September 2001, on the date set for the termination hearing, the district court rejected mother's due process argument, denied her petition for review, and proceeded to

conduct a termination hearing. The court also stated that it would consider any relevant issues at the termination hearing that could have been raised before the magistrate.

After hearing the evidence, the district court entered the judgment terminating mother's parental rights.

## II.

Mother contends she was deprived of her right to due process when the magistrate changed the permanency plan and ordered the transfer to district court without first conducting a permanency hearing. According to mother, the June 28 proceeding did not constitute a "permanency hearing," and such a hearing was necessary to determine whether the permanency goal of reunification should have been changed to termination. Mother thus urges us to conclude the magistrate's order of July 11 transferring the case to the district court for hearing on the motion to terminate violated her right to due process.

We conclude that because mother had a full and fair opportunity to be heard at the termination hearing, her right to due process was not violated, and we therefore perceive no basis for reversal.

■ Due process is flexible and calls for such procedural protections as the particular situation demands. *People v. Taylor*, 618 P.2d 1127, 1135 (Colo.1980); *see People in Interest of Dveirin*, 755 P.2d 1207, 1211 (Colo.1988)(holding that "certification proceedings [conducted] subsequent to the certification for short-term [mental health] treatment adequately protected the respondent's due process rights"); *Eason v. Bd. of County Comm'rs*, 70 P.3d 600, 2003 WL 1562228 (Colo.App.2003).

■ A parent has a constitutionally protected liberty interest in the care, custody, and management of his or her child. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *B.B. v. People*, 785 P.2d 132 (Colo.1990).

■ Termination of the parent-child legal relationship is a drastic remedy and a parent is entitled to procedural due process before termination occurs, but that entitlement must be balanced against other interests when the goal of reunifying the parent and child is abandoned by the department. *People in Interest of A.W.R.*, 17 P.3d 192, 196 (Colo.App.2000)(recognizing a foster parent's interest in "continued foster placement" arises when the "goal of reunification of the child with his or her natural family has been abandoned").

■ The greater the deprivation of the parent's interest, the greater the procedural protection that must be provided to the parent. *L.L. v. People*, 10 P.3d 1271 (Colo.2000). A parent is entitled to notice of the proceeding, advice of counsel, and a meaningful opportunity to be heard and defend. *People in Interest of E.S.*, 49 P.3d 1221 (Colo.App. 2002); *People in Interest of M.P.*, 690 P.2d 1300 (Colo.App.1984); *see B.B. v. People, supra* (in dependency and neglect proceedings, due process generally requires the state to provide fundamentally fair procedures); *People in Interest of A.M.D.*, 648 P.2d 625 (Colo. 1982).

### A.

■ Although mother does not allege a statutory violation, it is necessary to review the statutory scheme governing permanency hearings and termination in addressing her due process challenge to the procedure utilized here.

The Children's Code must be liberally construed to promote the welfare of children and the best interests of society. Section 19–1–102, C.R.S.2002. The Code sets forth the basic procedures to adjudicate a child as dependent or neglected at § 19–3–301, et seq., C.R.S.2002; to terminate parental rights at § 19–3–601, et seq., C.R.S.2002; and to review a child's placement needs at § 19–3–701, et seq., C.R.S.2002.

The Code provides that the state should make "reasonable efforts" to prevent the placement of abused and neglected children out of the home and to reunify the family whenever appropriate. Sections 19–1–103(89), 19–3–100.5, 19–3–208, C.R.S.2002; *see* § 19–1–115(7), C.R.S.2002 (identifying circumstances where reasonable efforts are

not required to prevent the child's removal from the home or to reunify the family).

After a child has been adjudicated dependent or neglected, a court may consider termination of a parent-child legal relationship upon the filing of a written motion alleging the factual grounds for termination. Section 19–3–602, C.R.S.2002.

Where, as here, the child is under six years of age when a petition in dependency and neglect is filed, the proceedings are expedited. *See* §§ 19–1–102(1.6), 19–1–123, 19–3–703, C.R.S.2002. The relevant statutes require that all proceedings be promptly resolved and that the trial court determine whether the child can be returned home.

### B.

Section 19–3–702(1), C.R.S.2002, the permanency hearing statute (formerly the "permanency planning hearing" statute), is separate from the statutory scheme governing termination procedures set forth above, though the statutes may overlap once a motion to terminate has been filed.

The permanency hearing statute applies whenever a child is placed in foster care. The statute requires the court to hold permanency hearings, to ensure that a plan to achieve permanency is established, and to review periodically the child's physical placement and agency efforts from the time a child is first placed in foster care.

A "permanency hearing" is defined as "a hearing in which the permanency plan for a child in foster care is determined by the court." Section 19–1–103(83.5), C.R.S.2002; *see* Chief Justice Directive 98–02, Memorandum of Procedures § VII.A (stating that purpose of permanency hearing is to "adopt a specific permanency plan for the child and to take significant steps toward implementing the permanency plan"). A hearing or action that is not open to the participation of the parties, such as a paper review, an ex parte hearing, or a stipulated agreement that has been made an order of the court, is not considered a permanency hearing. Section 19–3–702(1.5), C.R.S.2002.

A "permanency plan" is not separately defined in the statute, but its purposes are set forth in § 19–3–702. As relevant here, § 19–3–702 provides:

(1) In order to provide stable permanent homes for children in as short a time as possible, a court on its own motion or upon motion brought by any party shall conduct a permanency hearing if a child cannot be returned home under section 19–1–115(4)(b) for the purpose of making a determination regarding the future status of the child.

. . . .

(3) [With an exception not relevant here], at the permanency hearing, the court shall first determine whether the child shall be returned to the child's parent or guardian, pursuant to section 19–1–115(4)(b) and, if applicable, the date on which the child shall be returned, and whether reasonable efforts have been made to find a safe and permanent placement for the child. If the child is not returned to the custody of the child's parent or guardian, the court shall determine whether there is a substantial probability that the child will be returned to the physical custody of the child's parent, guardian, or legal custodian within six months. If the court so determines, it shall set another review hearing for not more than six months, which shall be a permanency hearing.

(3.5) At any permanency hearing conducted by the court, the court shall make determinations as to the following:

(a) Whether procedural safeguards to preserve parental rights have been applied in connection with any change in the child's placement or any determination affecting parental visitation of the child; [and]

(b) Whether reasonable efforts have been made to finalize the permanency plan that is in effect at the time of the permanency hearing. . . .

At all subsequent permanency hearings, the court must determine whether the child's safety is protected in the placement, whether reasonable efforts have been made to find a safe and permanent placement, the continuing necessity for and appropriateness of the placement, the extent of compliance with the

case plan, and the progress that has been made toward alleviating or mitigating the causes necessitating placement in foster care. The court must also project a likely date by which the child may be returned to and safely maintained at the home, placed for adoption, legal guardianship, or guardianship of the person, or placed in another permanent safe placement setting. Section 19–3–702(6)(a), C.R.S.2002.

If the trial court concludes there is not a substantial probability the child will be returned home within six months, it must enter an order determining the child's future placement status. Section 19–3–702(4), C.R.S. 2002; *People in Interest of H.R.*, 883 P.2d 619 (Colo.App.1994).

The Code is silent regarding the procedures or standards required to change a permanency plan goal from reunification to termination or to modify permanency plans. However, other jurisdictions have addressed these issues by statute or rule. *See, e.g.*, Cal. Rules of Court 1466(b) (providing that, upon its own motion or a party's motion, a court may order a new permanent plan "at any subsequent [review] hearing" if circumstances have changed); Conn. Gen.Stat. § 17a–15 (2002)(providing that any provision of a placement plan may be challenged at a hearing upon written request); Iowa Code § 232.104(6) (2002)(providing that modification to a permanency order "shall be accomplished through a hearing procedure following reasonable notice"); Utah Code Ann. § 78–3a–311(2)(b)(iii) (2002)(providing that the court may amend a child's primary permanency goal before the establishment of a final permanency plan, and "[i]f, at [any time], the court determines that reunification is no longer a child's primary permanency goal, the court shall conduct a permanency hearing").

We are unaware of any reported Colorado appellate opinions that have clarified the extent of a parent's due process rights during the permanency hearing stage. But, the Montana Supreme Court has held that absent a statutory provision, a parent's due process rights with regard to the permanency plan are minimal. *See In re Custody of M.W.*, 305 Mont. 80, 23 P.3d 206 (2001)(par-

ent has no due process right to representation by counsel or to challenge the state's evidence at the permanency plan hearings held before the termination hearing).

### C.

At issue is whether mother had a due process right to have a permanency hearing *before* the magistrate changed the permanency plan goal and transferred the case to the district court for a termination hearing. We conclude mother's due process rights were adequately protected when the district court broadened the scope of the termination hearing and allowed her a full and fair opportunity at the termination hearing to address any issues regarding the change in the permanency plan.

We reach this conclusion while agreeing with mother that the June 28 hearing before the magistrate was not a "permanency hearing," as contemplated by § 19–3–702. Although the parties appeared before the magistrate pursuant to the People's amended notice of a permanency hearing, the parties simply discussed the People's modified permanency plan and the fact that the People intended to file a motion to terminate. *See* § 19–3–702(1.5)(3.5), C.R.S.2002.

Before the case was transferred to the district court, the magistrate conducted numerous hearings during which mother was given a reasonable opportunity to be heard on all issues affecting her parental rights, including visitation, the efforts made by the department to reunite the family, placement alternatives, the concurrent plan for the child, and less drastic alternatives.

The initial goal of the permanency plan was to terminate the parent-child legal relationship. As of the April 24, 2001, hearing, the parties agreed to change the goal to reuniting mother with the child. At the May 17 hearing, the magistrate formally changed the permanency plan to reflect the goal of reunification, and on June 4, the parties stipulated to unsupervised visitation by mother. But, on June 28, the People informed the magistrate of the department's serious concerns about mother's ability to provide the child with a safe environment, as outlined in

the report of June 27, which recommended termination.

The department's report was incorporated by reference in the magistrate's July 11 order. Given the serious concerns raised in that report, the magistrate properly concluded the district court should resolve the issues and transferred the case accordingly. *See* § 19–1–108(3)(c), C.R.S.2002.

The permanency hearing statute, § 19–3–702, and the termination statutes, § 19–3–601, et seq., do not require modification of a permanency plan before the department may seek termination of the parent-child legal relationship. The department is entitled to move for termination at any time, and termination is proper after the procedures and findings required by statute. *See* §§ 19–3–602, 19–3–604, C.R.S.2002.

We conclude mother had a reasonable opportunity at the termination hearing to be heard on the issue of the change from the permanency planning goal of reunification to one of termination. *See People in Interest of E.S., supra; People in Interest of M.P., supra; cf. People in Interest of Dveirin, supra.* Therefore, we reject her contention that her right to due process was violated.

### III.

■ Mother also contends that she was not properly advised of her legal and constitutional rights before the June 28 review hearing by the magistrate and that the July 11 permanency planning order was therefore improper. We disagree.

When the permanency planning phase of the proceeding was initiated, mother received written advisement of her legal and constitutional rights, as required by § 19–3–702(2), C.R.S.2002. Although she was not notified again of those rights before the June 28 review hearing, she received a notice reciting that it was to be a permanency hearing. While permanency planning was not expressly discussed on June 28, the People tendered a motion "to terminate," which was accepted by the magistrate before the matter was transferred to the district court.

We thus conclude that mother was adequately advised before the June 28 review hearing and that the July 11 order was erroneous for these reasons.

### IV.

■ Next, mother contends the magistrate violated her right to due process by failing to make express findings pursuant to § 19–3–702(3.5)(a), C.R.S.2002, and by failing to consider a less drastic alternative such as placement with a relative. Again, we disagree.

The lack of express findings pursuant to § 19–3–702(3.5)(a) does not in itself establish that the magistrate failed to observe procedural safeguards to protect mother's rights. Further, even though a hearing was not conducted prior to the child's transfer to a foster-adopt home, mother's parental rights were protected because the magistrate ordered the department to monitor the placement carefully to assure that it did not interfere with reunification.

As to the possibility of an alternative placement with relatives, mother abandoned her initial request for placement of the child with the maternal aunt, and she agreed to ongoing foster care placement.

Mother also contends there should have been more court supervision, but the concurrent planning statute, § 19–3–508(7), C.R.S. 2002, does not require court supervision of a concurrent plan. If a party objects to the concurrent plan or its implementation, the party may bring the matter to the attention of the court.

Accordingly, we conclude mother was accorded due process during these proceedings.

### V.

■ Mother next contends the magistrate's order of May 17, 2001, approving the child's ongoing placement with the foster family violated mother's right to due process because the placement was not discussed at that hearing and the order was not properly mailed to the parties. We disagree.

The order was based on an agreement by the parties that the magistrate accepted on April 24 and set for review on May 17. Because mother was present and agreed to

the child's placement on April 24, we conclude her due process rights were not violated by the magistrate's failure to mail the order to her.

## VI.

■ Finally, mother contends the evidence was insufficient to support termination. We disagree.

■ Termination of the parent-child legal relationship pursuant to § 19–3–604(1)(c), C.R.S.2002, requires clear and convincing evidence establishing that: (1) there was an appropriate treatment plan approved by the trial court; (2) the parent has not complied with the treatment plan, or the plan has not been successful in rehabilitating the parent; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. *People in Interest of A.M.D., supra.*

■ Before ordering termination, a trial court also must consider and eliminate less drastic alternatives. *People in Interest of M.M.,* 726 P.2d 1108 (Colo.1986).

■ The credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence, as well as the inferences and conclusions to be drawn therefrom, are within the discretion of the trial court. Thus, a trial court's findings and conclusions will not be disturbed on review if the record supports them. *People in Interest of C.A.K.,* 652 P.2d 603 (Colo.1982).

■ An appropriate treatment plan is one "that is reasonably calculated to render the particular [parent] fit to provide adequate parenting to the child within a reasonable time and that relates to the child's needs." Section 19–1–103(10), C.R.S.2002. The appropriateness of a treatment plan is measured by its likelihood of success in reuniting the family and must be assessed in light of the facts existing at the time of its approval. *People in Interest of M.M., supra.*

### A.

According to mother, the treatment plan was inappropriate because the child was not placed with a relative pursuant to § 19–3–508(5)(b), C.R.S.2002, and an evaluation for placement required by § 19–1–107, C.R.S. 2002, was not conducted. We disagree.

Placement determinations relate to the disposition of the child, not to the treatment of the parent. *See* §§ 19–1–107(2), 19–3–213, 19–3–508(5)(b), C.R.S.2002. The failure to comply strictly with the statutory provisions regarding a child's placement does not render a treatment plan inappropriate. *See* § 19–1–103(10).

In this case, compliance with the treatment plan would have been frustrated if the child had been placed with her aunt, because it took several hours to drive there from mother's residence. Mother acknowledged this circumstance when she agreed to continuing foster care placement in Larimer County to facilitate the goal of reunification.

As to mother's contention that there was no concurrent planning pursuant to § 19–3–508(7), concurrent planning affects the disposition of the child and the failure strictly to comply with the concurrent planning statute does not impact the appropriateness of a treatment plan. *See* § 19–1–103(10). Here, the concurrent plan for the child was reunification or termination and adoption.

Mother also argues that the treatment plan was rendered inappropriate when the child's therapist was changed without amendment of the plan. The treatment plan recited that the child was seeing a particular therapist and required that she continue in therapy until released by her therapist. But the plan did not require that the child remain in therapy with the named therapist. Accordingly, we reject mother's contention.

### B.

Mother next contends that in the absence of an evaluation for placement, the district court did not properly consider permanent guardianship as a less drastic alternative to termination. Again, we disagree.

■ In considering less drastic alternatives, the trial court must give primary consideration to the physical, mental, and emotional conditions and needs of the child. Section 19–3–604(3), C.R.S.2002; *People in*

*Interest of M.M., supra.* Thus, long-term placement or legal guardianship with a relative is not a viable less drastic alternative if the child needs a stable, permanent home that can be assured only by adoption. *See People in Interest of E.I.C.,* 958 P.2d 511 (Colo.App.1998); *People in Interest of S.T.,* 678 P.2d 1054 (Colo.App.1983).

The maternal aunt testified that she was willing to provide care for the child until she reached eighteen and that mother and the child should have an ongoing relationship. However, two mental health professionals and the case worker testified that the child, who was then three years old, needed to form a healthy attachment with a primary caretaker as soon as possible. They further testified that an adoptive home would best meet the child's need for permanency.

Thus, even though a formal evaluation for placement was not presented to the district court, the record supports its finding rejecting guardianship as a less drastic alternative to termination, and that finding may not be disturbed on review. *See People in Interest of C.A.K., supra.* We therefore conclude the evidence was sufficient to support termination.

Judgment affirmed.

Judge TAUBMAN and Judge WEBB concur.