2014 COA 121

**The PEOPLE of the State of Colorado, Petitioner–Appellee,**

**IN the INTEREST OF M.D., a Child,**

**and**

**Concerning C.D., Respondent–Appellant,**

**and**

**V.S. and C.S., Intervenors.**

**Court of Appeals No. 14CA0522**

Colorado Court of Appeals, Div. VI.

Announced September 11, 2014

Sheryl Rogers, County Attorney, Linda L. Boulder, Special County Attorney, Durango, Colorado, for Petitioner–Appellee.

Beth Padilla, Guardian Ad Litem.

Jon Lewis Kelly, PC, Jon L. Kelly, Dolores, Colorado, for Respondent–Appellant.

Dianne A. Pacheco–VanVoorhees, Denver, Colorado, for Intervenors.

Opinion by JUDGE RICHMAN

¶1 In this dependency and neglect proceeding, C.D. (father) appeals from a judgment allocating a majority of parenting time and sole decision making authority for M.D. (the child) to V.S. and C.S. (the foster parents). We affirm.

## I. Background

¶2 In May 2011, the La Plata County Department of Human Services (department) filed a petition in dependency and neglect due to its concerns about the parents' domestic violence and substance abuse. That same month, the child was placed in the foster home, briefly returned to father, and then replaced in the foster home, where she remained throughout the case. The child's mother is not involved in this appeal—her rights were terminated when she stopped visiting the child after June 2012 and failed to comply with her treatment plan.

¶3 Based on father's admission to certain allegations in the petition, including that he tested positive for methamphetamine, the court adjudicated the child dependent and neglected and adopted a treatment plan for father. Father did not initially comply with his treatment plan, but after he was arrested and placed on probation for a domestic violence conviction, he began to fulfill the tasks outlined in the plan.

¶4 In July 2012, to achieve permanency for the child within the twelve-month guideline set out in section 19–3–703, C.R.S. 2013, the department moved to terminate the parent-child legal relationship between father and child. The child, then three years old, had been in foster care for over a year. However, the termination hearing did not conclude until February 2013.

¶5 During the long delay between the filing of the termination motion and the conclusion of the termination hearing, father completed his treatment plan. Nonetheless, after the termination hearing, the court terminated his rights. Father appealed the termination order.

¶6 In *People in Interest of M.D.*, 2013 WL 5574513 (Colo.App. No. 13CA0515, Oct. 10, 2013) (not published pursuant to C.A.R. 35(f))

(*M.D. I*), a division of this court reversed the judgment terminating the parent-child legal relationship between father and child because the court could not determine the basis for the order. The division remanded the case to the trial court to reexamine the evidence, hear new argument and evidence of circumstances occurring since the termination hearing, and make new findings under the termination statute, section 19–3–604(1)(c), C.R.S. 2013.

¶7 Upon remand, neither the department nor the guardian ad litem (GAL) pursued termination of father's rights. The department acknowledged that, under then-current circumstances, it would have difficulty proving that father was unfit. Both the department and the GAL asserted that the child needed permanency and, instead of termination, requested that the court enter permanent orders allocating parental responsibilities to the foster parents with parenting time for father. The foster parents had also filed a petition for allocation of parental responsibilities in a separate domestic relations case, which was certified into the dependency and neglect case under section 19–1–104(4)(a), C.R.S. 2013, so that the juvenile court could determine custody.

¶8 The juvenile court held a permanency hearing under section 19–3–702, C.R.S. 2013 (the permanency hearing statute). Father, represented by counsel, fully participated in the hearing and initially requested that full custody of the child be returned to him. Although he acknowledged that the foster parents had served an important role in the child's life, that the child loved them, and that he was willing to have the court order visitation with them, he continued to request primary custody.

¶9 The court determined that "it must evaluate the question of whether there [was] a compelling reason not to return [the child's] custody to [father] based upon the totality of circumstances," stating, "[T]he [c]ourt can consider not just [father's] capacity as a parent, but also factors that bear upon the child's best interests, including [the child's] need for permanency, her attachment to her current foster family, and the risk of emotional and psychological harm that may

occasion disruption of that attachment." The court found several compelling reasons not to return the child to father's care.

¶ 10 Consequently, the court granted to the foster parents sole decision making and a majority of parenting time, and to father parenting time pursuant to a step-up parenting schedule, which was proposed by a mediator and endorsed by the department and provided for increasing visitation by father. The court then directed the foster parents to file a proposed order to be certified into a domestic relations case and directed the clerk to close the dependency and neglect case.

¶ 11 On appeal, father contends that the court erred in concluding that it need only find a compelling reason to allocate parental responsibility to a nonparent under the permanency hearing statute. He asserts six ways in which the court's order was insufficient. We address each in turn.

## II. Law

¶ 12 As noted by father, one purpose of the Children's Code is the preservation of family ties whenever possible. § 19–1–102(1)(b), C.R.S. 2013. But, its overriding purpose is to protect the welfare and safety of children by providing procedures through which their best interests can be served. *L.G. v. People*, 890 P.2d 647, 654 (Colo.1995). To this end, a dependency and neglect action focuses primarily on the protection and shelter of children who are susceptible to harm from the effects of abuse and neglect. *Id.* at 655. Consequently, the supreme court has declared that the safety of the child and not the custodial interest of the parent is the paramount concern. *Id.*

¶ 13 In addition, the General Assembly has declared that children removed from their home should be offered certain guarantees. § 19–1–102(1.5). Among these is assurance of long-term permanency planning. § 19–1–102(1.5)(III).

¶ 14 The permanency hearing statute applies whenever a child is placed in foster care. *People in Interest of M.B.*, 70 P.3d 618, 623 (Colo.App.2003); *see also* § 19–1–103 (83.5), C.R.S. 2013. It provides for the

adoption and implementation of a specific permanency plan for a child placed into foster care during the pendency of a dependency or neglect proceeding. *People in Interest of C.M.*, 116 P.3d 1278, 1281–82 (Colo.App. 2005). Its stated purpose is "to provide stable permanent homes for children in as short a time as possible." § 19–3–702(1).

¶ 15 The permanency hearing statute seeks to ensure that there is a plan for the child to achieve permanency. *M.B.*, 70 P.3d at 623. It also requires periodic review of the child's placement and the department's efforts to achieve the child's permanency plan. *Id.* The permanency hearing statute is separate from the statutory scheme governing termination of parental rights. *Id.*

¶ 16 Because the child in this case was less than six years old when she was removed from the home, she was subject to expedited permanency planning statutes, "which are intended to swiftly place the youngest—and thereby most vulnerable—children in permanent homes." *A.M. v. A.C.*, 2013 CO 16, ¶ 19, 296 P.3d 1026; *see also* §§ 19–1–102(1.6), 19–1–123, 19–3–703, C.R.S. 2013. As noted by the supreme court, "[a] critical bonding and attachment process occurs before children reach six years of age, and children who have not bonded with a primary adult during that time suffer emotional damage that can lead to chronic psychological problems and antisocial behavior." *People in Interest of A.J.L.*, 243 P.3d 244, 250 (Colo.2010).

## III. Failure to Comply with the Mandate

¶ 17 First, father contends that the court erred because it failed to comply with the mandate in *M.D. I*. Specifically, he asserts that the court erred in disregarding *M.D. I's* direction to provide father the opportunity to work toward reunification, even though the department withdrew the termination motion. We disagree.

¶ 18 When an appellate court remands a case with specific directions to enter a particular judgment or to pursue a prescribed course, a trial court has no discretion except to comply with the instructions. *Musgrave v. Indus. Claim Appeals Office*, 762 P.2d 686, 687–88 (Colo.App.1988). How-

ever, when a case is remanded for further proceedings consistent with the appellate court's opinion, it is a general remand. *Id.* at 688. A general remand authorizes the trial court to make new findings and conclusions so long as there is no conflict with the appellate court ruling. *Id.*

¶ 19 Here, this court reversed and remanded the case for further findings consistent with the termination statute. Although the opinion stated, "[I]f the trial court determines that the termination criteria have not been proven by clear and convincing evidence, then the trial court is directed to order father to comply with an appropriate treatment plan [and] also provide him with a reasonable period of time to comply with the treatment plan," the outcome of the termination motion was left to the court's discretion. Thus, it was a general remand, and the court was not required to pursue a prescribed course.

¶ 20 Since no party moved to terminate father's rights on remand, we conclude that the court did not err in failing to reexamine the evidence, take additional evidence, and make findings consistent with the termination statute. Similarly, since the court was not asked to address, and did not decide, the termination motion, it did not err in failing to follow *M.D. I's* instruction to provide father with time to comply with an appropriate treatment plan. *Id.*

## IV. Applicability of Section 19–1–115, C.R.S. 2013

¶ 21 Second, father contends that the court erred in failing to make findings required under section 19–1–115(6.5). He argues that when a child is placed outside the home, the court is required to find that out-of-home placement is in the child's best interests, that reasonable efforts have been made to reunite the child and family or are not required, and that procedural safeguards with respect to parental rights have been applied. *See* § 19–1–115(6.5). We disagree.

¶ 22 Section 19–1–115 is a general provision concerning awards of temporary legal custody for determinate periods made during the pendency of any proceeding under the Children's Code. *C.M.,* 116 P.3d at 1281.

Because section 19–1–115 concerns only temporary custody awards and the court's order here was a permanent custody order, we conclude that the findings under section 19–1–115(6.5) were not required.

## V. Section 19–3–702(3)

¶ 23 Third, father contends that the court's order fails to comply with section 19–3–702(3). Specifically, he asserts that insufficient evidence supports the court's finding that the child could not be returned to his custody. We disagree.

¶ 24 Section 19–3–702(3) requires the court to determine whether a child can be returned to a parent's custody, whether reasonable efforts have been made to find a safe and permanent home for the child, and whether there is a substantial probability that the child can be returned to the parent's custody within six months.

¶ 25 A court's factual findings will be upheld if the record supports them. *People in Interest of C.A.K.,* 652 P.2d 603, 613 (Colo. 1982).

¶ 26 The court found that it was unlikely that the child could be returned to father within six months. It also found that father could not take custody that day and that the child could not remain in limbo any longer. These factual findings are supported by the record.

¶ 27 The child's therapist testified that the child's primary attachment moved to the foster family with the passage of time while the case was pending and that the child identified her foster parents and siblings as her family.

¶ 28 When asked if the child could be transitioned back to father, the therapist opined that the passage of time would make reunification difficult because, by that point, the child had been out of father's custody for over half her life, which was "huge for a little child." She believed any attempt to remove the child from the foster parents and reunite her with father at this late stage would harm the child's social and emotional well-being and impact her for the rest of her life. She

also opined that the child "needs to know where home is going to be."

¶ 29 In addition, an expert in early childhood development and attachment opined that, after a child spends thirty-three months out of a parent's care, the parent-child connection is broken. She related that children hold parents responsible for that loss, which can contribute to "a foundational mistrust" in the relationship. She testified that a parent and child "would need to heal the failures of their old relationship first before they could even begin to build something healthy." She believed that the best chance for establishing a healthy parent-child relationship in such circumstances was to maintain a secure base of stability for the child in her current home, so that she feels safe to explore and invest in a relationship with the parent. In its order, the court specifically credited this testimony.

¶ 30 Because there is evidence in the record that the child needed permanency and that a complete transition back to father would be difficult and probably result in harm to the child, the court's findings that custody could not be returned to father and that there was not a substantial probability that custody could be returned in six months are supported by the record. Thus, we will not disturb them on review. *See id.*

## VI. Section 19–3–702(3.5)

¶ 31 Fourth, father contends that the court erred in failing to make findings under 19–3–702(3.5), which requires the court to find that procedural safeguards to preserve parental rights have been applied and that reasonable efforts have been made to finalize the permanency plan. We perceive no reversible error.

¶ 32 Although subsections (a) and (b) of section 19–3–702(3.5) require the court to "make determinations," the failure of the court to make express determinations alone does not establish a failure by the court to observe procedural safeguards to protect father's rights or to ensure that reasonable efforts were undertaken. *People in Interest of L.B.,* 254 P.3d 1203, 1207 (Colo. App. 2011); *People in Interest of E.C.,* 259 P.3d 1272, 1277 (Colo. App. 2010).

¶ 33 As to procedural safeguards, the court asked the parties to file position statements before the hearing, in which father was represented by counsel. The court also adopted a parenting time order that allowed father to continue to develop his relationship with the child.

¶ 34 After father's rights were initially terminated, the court changed the child's permanency goal from reunification with father to adoption by a nonrelative. Section 19–3–702(3.5)(b) requires the department to make reasonable efforts to finalize the permanency plan that is in effect. It is true that the department failed to make reasonable efforts to finalize the child's adoption by a nonrelative because it abandoned its efforts to pursue termination of father's rights after the appeal. Instead, the department decided to pursue an allocation of parental rights to the foster parents and establish a parenting time plan for father.

¶ 35 As to reasonable efforts to finalize this permanency plan, the department paid for mediation for father and the foster parents to attempt to form their own parenting plan. It also paid for two sessions between a therapist and father and the foster parents so that they could discuss better meeting the child's needs. Although these efforts were directed at a plan not in effect, the statute was satisfied because the department provided a secure and stable environment for the child with the foster parents, while at the same time preserving the father-child relationship. Under these circumstances, we perceive no prejudice to father.

¶ 36 Father also appears to contend that he should have had an opportunity under this provision to comply with the treatment plan (or an amended treatment plan) and that that procedural safeguard was not met. However, the trial court assumed father was fit; thus, his compliance with a treatment plan designed to render him fit was not at issue in the permanency hearing.

¶ 37 We conclude that despite the absence of specific findings, the record reflects that the department made reasonable efforts to finalize permanent placement of the child and that procedural safeguards were in place to

protect father's rights. *See L.B.,* 254 P.3d at 1207; *E.C.,* 259 P.3d at 1277.

## VII. Section 19–3–702(5)(b)

 ¶ 38 Fifth, father contends that the court erred in failing to make a finding under section 19–3–702(5)(b) that the child's removal from the foster home would be seriously detrimental to the child's emotional well-being. We disagree.

¶ 39 We first note that the trial court found, in accordance with section 19–3–702(4), that there were compelling reasons that it would not be in the child's best interests to return to father's home. Once the court has made such findings, we disagree that the statute requires the court to also conclude that removing the child from the foster home would be "seriously detrimental to the emotional well-being of the child."

¶ 40 Here, the effect of the court's conclusion not to return the child home under section 19–3–702(4) was that the child would remain in the foster home. Because the court already determined that the child would remain in the foster home, there was no need for the court to consider the impact on the child of removal from the foster home.

¶ 41 This reading of the statute is consistent with the language of section 19–3–702(5), which begins, "In order to enable the child to obtain a permanent home, the court *may* make the following determinations and orders." (Emphasis added.) Because the statute uses the permissive "may," the trial court is not required to make such findings. *M.S. v. People,* 2013 CO 35, ¶ 14, 303 P.3d 102 (noting that "a trial court *may* consider whether the foster parents are capable and willing to provide a stable and permanent environment, but the court is not required to do so"). The determination under section 19–3–702(5) is permissive, and it is not necessary once the court determines that there are compelling reasons not to return the child to the parent's home. Thus, the trial court did not err in failing to make the finding allowed under section 19–3–702(5).

## VIII. Lack of Unfitness Finding

 ¶ 42 Sixth, father last contends that the court erred in determining that a finding of unfitness was not required before allocating parental responsibilities to the foster parents. He asserts that recent supreme court cases have indicated that parents have a fundamental liberty interest in their children, though foster parents do not have an equivalent interest in their foster children. Consequently, he argues that the court needed to find him unfit before allocating parental responsibilities to the foster parents to avoid violating his due process rights. We disagree.

¶ 43 Under section 19–3–702(4), the department must establish a compelling reason why it is not in the child's best interests to return home before the court may award permanent custody to a nonparent. *C.M.,* 116 P.3d at 1283. Though a parent's unfitness could be a compelling reason not to return a child home, a finding that a parent is unfit is not required to award permanent custody to a nonparent. *Id.* Hence, the permanency hearing statute directs the court to focus on the child's needs in addition to the strengths or deficiencies of the parent. *Id.* at 1282.

¶ 44 We reject father's assertion that the court must first find father unfit because parents have a fundamental liberty interest in their children, which foster parents do not have. Even in non-dependency and neglect custody cases, the court may award visitation to nonparents, notwithstanding the opposition of a parent, without demonstrating parental unfitness or significant harm to the child. *See In re C.A.,* 137 P.3d 318, 326 (Colo. 2006) (grandparents may be awarded visitation against parental wishes without demonstrating parental unfitness).

¶ 45 Father did not argue below that a presumption under *Troxel v. Granville,* 530 U.S. 57, 72–73, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), obligated the trial court to afford his preference for custody special weight. He also agreed with the trial court that it should apply a preponderance of evidence burden of proof rather than a clear and convincing burden of proof. *See L.L. v. People,* 10 P.3d 1271, 1276–78 (Colo. 2000).

¶ 46 Because father is not deprived of all of his parental rights, and because the trial court retains jurisdiction to modify its existing order, we hold that the trial court order relating to father's custody and visitation rights does not require a finding of unfitness to protect his fundamental liberty interest.

¶ 47 Here, the court found several compelling reasons as to why the child could not be returned home under section 19–3–702(4), including the following:

- the risk to the child's emotional and psychological well-being if her current placement were disrupted;
- father's lack of specialized parenting skills that could minimize the risks to the child's well-being;
- the uncertainty of how father would do once he was no longer under the supervision of the criminal justice system;
- the further delay in reaching permanency for the child if the case was continued to attempt to transition the child to father's care; and
- the uncertainty associated with whether an attempt to transition the child to father's care would be successful.

¶ 48 These findings are supported by the record. First, the court's finding that the child's well-being might be at risk if her placement were disrupted is supported by the record. The expert in early childhood development and attachment testified,

[I]t's very unnatural and traumatic for children to experience changes in caregivers because they are required to reorganize every time there's a shift in the caregiving relationship, and generally, particularly kids under six, their self-esteem is affected because they feel rejected in changing caregivers, and that has a very harmful effect on their development.

The child's therapist similarly testified that removing the child from the foster parents' home would be "like a death," which would likely harm her social-emotional well-being. The caseworker also recognized that the child had bonded with and was attached to the foster family and that disruption of that attachment would be detrimental to her.

¶ 49 Likewise, the record supports the court's finding that father lacked specialized parenting skills that could minimize risks to the child's well-being. The child's therapist testified that because of the loss of the child's parents when she was first placed in foster care, in addition to past deprivation, trauma, and chaos that she experienced, the child's social-emotional well-being had already been impacted adversely. The therapist observed visits between the child and father and noted that she would have liked to work with father on his controlling behaviors, attunement to the child, and parenting of a child who has experienced trauma. The caseworker also expressed concern that father underestimated the emotional impact on the child of a transition away from the foster parents. And, she was concerned about his ability to show empathy and put the child's needs above his own.

¶ 50 The uncertainty of how father would do once he was no longer supervised by the criminal justice system is also supported by the record. The caseworker noted father's long history of substance abuse, starting at a very early age and, by comparison, his relatively brief period of sobriety. She testified that putting stress on father, such as the stress of being a single parent, put his recovery at risk, thus putting the child at risk.

¶ 51 Similarly, the court's finding that delaying permanency to attempt a transition to father was not in the child's best interests is supported by the record. The child's therapist opined, "I believe her permanency, it's already [dragged] on too long." The caseworker noted that, under the expedited permanency placement guidelines, the child should have been in her permanent home in May 2012.

¶ 52 The court's finding that there was uncertainty as to whether the child could successfully transition to father's care is also supported by the evidence. The expert in early childhood development and attachment opined that transferring an attachment from one caregiver to another is complex. She hypothesized that forming a healthy attachment to father "would be possible, but ... there are enormous risk factors and ... we can't assume it would go [in] that direction."

¶ 53 We conclude that to award permanent custody to the foster parents, the trial court did not need to determine that father was unfit. *See C.M.*, 116 P.3d at 1283. Further, because the record supports the court's compelling reasons why it was not in the child's best interests to return home, we may not disturb on review the court's award of permanent custody to the foster parents. *See C.A.K.*, 652 P.2d at 613.

¶ 54 The judgment is affirmed.

JUDGE ROMÁN and JUDGE BOORAS concur.