24CA1696 Peo in Interest of LR 05-22-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1696
Weld County District Court No. 22JV133
Honorable Anita Crowther, Judge
Honorable Meghan Patrice Saleebey, Judge

---

The People of the State of Colorado,

Petitioner,

In the Interest of L.R. and D.R., Children,

and Concerning T.F.,

Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Gomez and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 22, 2025

---

No Appearance for Petitioner

Debra W. Dodd, Guardian Ad Litem

Patrick R. Henson, Office of Respondent Parents' Counsel, Justin Twardowski, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1     In this dependency and neglect action, T.F. (mother) appeals the juvenile court's judgment allocating parental responsibilities for L.R. and D.R. (the children) to D.R. (father).  We affirm.

## I.     Background

¶ 2     The Weld County Department of Human Services filed a petition in dependency and neglect regarding the children based on concerns about mother's mental health.  Following an alleged mental health crisis, in the fall of 2022, mother left Georgia — where the family had been residing — and traveled with the children to Colorado.  Father followed soon after and remained in Colorado for the duration of the case.  In September 2022, the juvenile court granted temporary legal custody of the children to father.

¶ 3     After adjudicating the children dependent and neglected, the juvenile court adopted treatment plans for the parents.

¶ 4     In July 2023, father moved for an allocation of parental responsibilities (APR).  After a September 2024 hearing, the juvenile court named father the primary residential parent, granted sole decision-making responsibility to father, and established a parenting time schedule for mother.

## II. Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA)

### A. Standard of Review and Relevant Law

¶ 5 We review de novo whether the juvenile court had subject matter jurisdiction under the UCCJEA. *People in Interest of S.A.G.*, 2021 CO 38, ¶ 21.

¶ 6 "The UCCJEA establishes a comprehensive framework that a Colorado court must use to determine whether it may exercise jurisdiction in a child custody matter or . . . must defer to a court of another state." *People in Interest of A.B-A.*, 2019 COA 125, ¶ 9. As relevant here, Colorado "[d]ependency and neglect proceedings must comply with the UCCJEA." *Id.*

¶ 7 Temporary emergency jurisdiction is available "if the child is present in this state and . . . it is necessary in an emergency to protect the child because the child . . . is subjected to or threatened with mistreatment or abuse." § 14-13-204(1), C.R.S. 2024.

¶ 8 A court may also exercise non-emergency jurisdiction. *S.A.G.*, ¶ 26. Section 14-13-201(1), C.R.S. 2024, details four paths to non-emergency jurisdiction. *S.A.G.*, ¶ 26 (describing home-state,

2

significant-connection, more-appropriate-forum, and last-resort jurisdiction).

¶ 9    As relevant here, a court has jurisdiction to make an initial child-custody determination if

> (b) [a] court of another state does not have jurisdiction under a provision of law adopted by that state that is in substantial conformity with paragraph (a) of this subsection (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under a provision of law adopted by that state that is in substantial conformity with section 14-13-207 or 14-13-208, [C.R.S. 2024,] and:
>      (I) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and
>      (II) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships . . . .

§ 14-13-201(1)(b).

## B.    Additional Background

¶ 10    At the initial hearing, in September 2022, the juvenile court found that Colorado had temporary emergency jurisdiction under the UCCJEA.

¶ 11    Over a year later, on November 16, 2023, the juvenile court held a hearing regarding its UCCJEA jurisdiction.  At the hearing,

3

father testified that there were no custody orders concerning the children in another state, and they had lived in Georgia before coming to Colorado. Father also testified that he and the children had resided solely in Colorado for a little over a year. The Department and the guardian ad litem (GAL) acknowledged that Colorado was not the home state and therefore urged the court to take "more appropriate forum" non-emergency jurisdiction. Mother agreed with the Department and GAL. She also testified that she and the children had lived in Colorado since August or September 2022 and that the older child was born in Colorado and the younger child was born in Georgia.

¶ 12     The juvenile court determined that it had "more appropriate forum" non-emergency jurisdiction. In doing so, the court acknowledged that "Colorado was not the home state . . . when [the petition] was . . . [filed]." The court next found that, while Georgia would have initially been the home state, there were no court cases pending in Georgia, and there "was not a request for Georgia to take over this case." The court then noted that "[a]ll the parties now reside here in Colorado and have done so for over a year." The court highlighted the following significant connections to Colorado:

4

(1) L.R. was born in Colorado; (2) mother moved to Colorado intending to remain in Colorado; and (3) the children had other family in Colorado.

¶ 13 Nearly a year after invoking "more appropriate forum" jurisdiction, and two years after taking emergency jurisdiction, in September 2024, the juvenile court held an APR hearing addressing, and granting, father's motion for APR.

## C. Analysis

¶ 14 We first conclude that the juvenile court had jurisdiction to issue the challenged APR judgment. The juvenile court appropriately found that the requirements in subparagraphs (I) and (II) of section 14-13-201(1)(b) were met. There are two ways to satisfy this section. Either (a) "[a] court of another state does not have jurisdiction under a provision of law adopted by that state that is in substantial conformity with paragraph (a) of this subsection (1)" *or* (b) "a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under a provision of law adopted by that state that is in substantial conformity with section 14-13-207 or 14-13-208." § 14-13-201(1)(b).

¶ 15     It is undisputed that neither parent started a child-custody proceeding in Georgia.  And after the family, including the children, had been in Colorado more than six months, Georgia could no longer be the home state.  *See* Ga. Code Ann. § 19-9-61(a)(1) (2024). Subsection (a)(1) of Georgia's statute provides:

> This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state[.]

*Id.*; *see also* § 14-13-201(1)(a) (Colorado's equivalent provision sets the timeframe at 182 days).  A Georgia court could have taken jurisdiction if father had remained in Georgia and promptly started a child-custody action in Georgia (within 182 days), but that did not happen.  So after the parents and the children were absent from Georgia more than 182 days, there was no reason for Georgia to take jurisdiction.  *See, e.g.*, *Christine L. v. Jason L.*, 874 N.Y.S.2d 794, 797 (Fam. Ct. 2009) ("[The] parent remaining in what was the home state of the child has a window of opportunity to petition a court for relief"; thus, "'home state' for purposes of initial custody determinations . . . includes situations where a state qualified as

6

the 'home state' at any time during the six months before commencement."); *In re Marriage of Myrland*, 2010 MT 286, ¶ 17 ("[I]f a parent takes the child from the home [s]tate and seeks an original custody determination elsewhere, the stay-at-home parent has six months to file a custody petition under the extended home state jurisdictional provision of [the Montana UCCJEA statute], which will ensure that the case is retained in the home [s]tate." (quoting Mont. Code Ann. § 40-7-109 commissioners' note (2024))) (first alteration in original).  So there was no competing jurisdiction.

¶ 16    Moreover, the older child was born in Colorado and substantial evidence to determine an appropriate APR for the children was in Colorado:

- both parents remained in Colorado for about two years after the court issued its emergency temporary orders;

- consistent with the temporary orders, the children lived with, and were under the care of, father in Colorado;

- mother exercised supervised parenting time in Colorado;

- the children had extended family in Colorado;

- other caregivers for the children were in Colorado; and

- the children's GAL was in Colorado.

¶ 17   Considering the absence of a competing jurisdiction and the significant connections to Colorado, the Colorado juvenile court appropriately determined it had jurisdiction to enter the subject APR judgment and the record supports its determination. *See S.A.G.*, ¶ 21.

¶ 18   Having concluded the juvenile court properly exercised jurisdiction, we next address mother's substantive claims on appeal.

### III.   Allocation of Parental Responsibilities

#### A.   Standard of Review and General Law

¶ 19   Allocating parental responsibilities is within the juvenile court's discretion, and we will not disturb its determination if competent evidence supports it. *See People in Interest of A.M.K.*, 68 P.3d 563, 565 (Colo. App. 2003). A court abuses its discretion when its ruling is "manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law." *People in Interest of M.H-K.*, 2018 COA 178, ¶ 60. However, whether the court has applied the correct legal standard is a question of law that we review de novo. *In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15.

¶ 20    The credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence, as well as the inferences and conclusions to be drawn therefrom, are matters within the juvenile court's discretion.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15; *see also B.R.D.*, ¶ 15 (when the record supports the court's findings, its resolution of conflicting evidence is binding on review).

¶ 21    When allocating parental responsibilities in a dependency and neglect proceeding, the juvenile court must consider the legislative purposes of the Children's Code.  *People in Interest of A.S.L.*, 2022 COA 146, ¶ 12.  Ultimately, the court must allocate parental responsibilities in accordance with a child's best interests.  *Id.*

### B.    Fitness

¶ 22    Mother contends that the juvenile court erred by finding that she was unfit to parent.  We discern no basis for reversal.

¶ 23    Although a juvenile court must find that a parent cannot become fit within a reasonable time before it may terminate parental rights, *see* § 19-3-604(1)(c)(III), C.R.S. 2024, no such finding is required before a court may allocate parental responsibilities between parents.  Nonetheless, a parent's unfitness

could be a compelling reason to not return a child to that parent. *People in Interest of M.D.*, 2014 COA 121, ¶ 43.

¶ 24    While not required, the juvenile court determined that mother was unfit. Specifically, the court found that mother had not addressed the mental health concerns — namely, her paranoia — that led to the Department's involvement; she had not engaged in mental health treatment; she continued to exhibit the same problems without adequate improvement; and "unless supervised, [she] continue[d] to pose a danger to the children." Although the court made no specific findings about mother's compliance with her treatment plan, nothing in the record reveals that mother made progress on the plan's objectives. To that end, the visitation supervisor and the caseworker testified about continuing safety concerns related to mother's paranoia and dysregulation, especially during her visits with the children. The visitation supervisor and the caseworker next testified about mother's unwillingness to engage in pre- and post-visit coaching. Mother inconsistently attended some mental health treatment but, according to her therapist, mother "needed more therapy." Mother had stable housing with the maternal grandmother; but there were concerns

10

about conflict between them such that mother had requested that visits not be in their home. The caseworker opined that mother did not recognize the impact her mental health had on the children. Consequently, the caseworker remained concerned about mother's ability to safely care for the children. Accordingly, the court did not err in not returning the children to mother. *See id.* at ¶ 43.

### C. Primary Residential Parent

¶ 25 Mother contends that the juvenile court erred by naming father the children's primary residential parent. In particular, she asserts that the children were attached to her and their bond would be severed if father moved back to Georgia. We discern no basis for reversal.

¶ 26 "[I]n an initial determination to allocate parental responsibilities, a court has no statutory authority to order a parent to live in a specific location." *Spahmer v. Gullette*, 113 P.3d 158, 159 (Colo. 2005). The court must accept the location in which each parent intends to live and allocate parental responsibilities according to the child's best interests. *Id.*; *see also People in Interest of H.K.W.*, 2017 COA 70, ¶ 13 (a court may consider the factors under the Uniform Dissolution of Marriage Act, § 14-10-

124(1.5), C.R.S. 2024, but it must focus on the child's protection and safety rather than the parents' custodial interests).

¶ 27     In naming father the children's primary residential parent, the juvenile court determined that father was fit and able to meet the children's needs. The court found that father had "dropped everything in his life to come to Colorado to make sure he was here for his children." The court also found that father had acted as the primary caregiver during the case and, without the Department's assistance, had found appropriate employment, housing, and child care in Colorado.

¶ 28     The juvenile court considered father's intent to return to Georgia and mother's desire for the children to stay in Colorado. The court found that the whole family resided in Georgia before mother transported the children to Colorado. The court next found that father had family support and "more resources available" in Georgia. The court noted "significant concerns with [m]other's request" because her mental health issues persisted, and she had not engaged in mental health treatment.

¶ 29     The record supports the juvenile court's findings. After mother brought the children to Colorado, father immediately

relocated, and the children were placed in his care. Father secured housing, employment, and child care throughout the case. The Department had no safety concerns about the children being in father's care. In fact, the caseworker testified that father had successfully completed his treatment plan and could meet the children's needs. The caseworker opined that the children should remain in father's primary care because they had been with him for the entire case, and "he ha[d] proven that he is able to care for the girls in all necessary ways." In contrast, as mentioned above, the Department continued to have concerns about mother's mental health and ability to keep the children safe even within a supervised setting.

¶ 30 The record also reveals that father intended to return to Georgia. Father had family and other support in Georgia. The caseworker testified in support of father's request to return to Georgia, noting that father did not have the support in Colorado that he had in Georgia. Father confirmed his commitment to having mother "be involved as much as possible" with the children even after he moved to Georgia.

¶ 31    Because the juvenile court applied the relevant legal standard and the record supports its determination that father be named the primary residential parent, we will not disturb it.

## IV.    Disposition

¶ 32    We affirm the judgment.

JUDGE GOMEZ and JUDGE LUM concur.